```
          UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA

                  PARKERSBURG DIVISION
```

**DOUGLAS LIBERT,**

    **Plaintiff,**

v.                                    Case No. 6:10-cv-00558

**CITY OF PARKERSBURG ,**
**BENJAMIN WARD, aka "SANTA CLAUS,"**
**and DALLAS DONALDSON,**

    **Defendants.**

**PROPOSED FINDINGS AND RECOMMENDATION**

The undersigned has reviewed the Motion for Summary Judgment [ECF No. 16] filed by defendants City of Parkersburg ("Parkersburg"), Dallas Donaldson, and Police Officer Benjamin Ward, also known as "Santa Claus." After careful consideration, the undersigned recommends that the presiding District Judge grant the defendants' motion.

*I. BACKGROUND*

The plaintiff splits his time between residences on Elder Street and Buckeye Street, in Parkersburg, West Virginia. On Buckeye Street, the plaintiff's house was apparently next to the home shared by the Banky family and Donald Lucas, Jr. While a fence divided the two properties, the plaintiff states that he was regularly harassed and antagonized by his neighbors.[1] According to

---

[1] The undersigned assumes without deciding that the plaintiff's allegations are true. With the exception of the information from

the plaintiff, his neighbors, particularly Lucas, would regularly call him such epithets as "fag," (ECF No. 27, ex. 1 at 8), "faggot," id. at 20, and "butt fucker" of kids, id. at 27, and also call his wife a "bitch." Id. at 8.  Moreover, the plaintiff states that his neighbors would fail to control their aggressive dog, leave large amounts of dog feces in his yard, attempt to knock down with basketballs the utility cables that supplied electricity to his house, and left a postcard advertisement for the film Journey to the Center of Earth in his mailbox, upon which had been written "you will be taking a journey right to the center right to hell where you belong," id. at 34.  The plaintiff also asserts that Lucas threatened to assault him on numerous occasions, and on one instance tried to run the plaintiff and his wife off the road in his car.

    The plaintiff had apparently made repeated complaints about the Banky-Lucas canine and its fecal deposits when Lucas decided to confront the plaintiff on September 12, 2008.  On that date, the plaintiff heard someone pounding on his front door.  Lucas apparently queried to the plaintiff "do you hear me in there, you fag," and the plaintiff states that Lucas then threatened "you call the cop, you call about my dog one more time, fag, I am going to fuck you up and then I will call the police for you."  Id. at 9.

---

Ward's affidavit, the following facts are from the plaintiff's deposition transcript.

The plaintiff called the police, but was unhappy with the response that he received. He states that the responding officers instead laughingly asked where the dog feces were located, and told the plaintiff to stop calling about the fecal material; according to the plaintiff, the officers did not address the threats of Lucas whatsoever. After this incident, the plaintiff states that while he tried to get a restraining order against Lucas via attorney Michelle Rusan, Rusan was informed by the police that such orders could only be obtained against family members.

On September 28, 2008, the plaintiff asserts that he was in his car returning from the Wood County Public Library when he encountered Lucas, who was in his own car, on Buckeye Street. The plaintiff states that Lucas shouted through his open car window, "[p]ull over, fag. I am going to give you another reason to call the cops on me." Id. at 13. The plaintiff states that he pulled into his driveway, grabbed a can of anti-dog pepper spray, and exited his car. Lucas was right behind him, and, according to the plaintiff, drove his car into the side of the plaintiff's car. After Lucas exited his own car, the plaintiff states that Lucas grabbed the spray from him and then sprayed it on the plaintiff, briefly chased the plaintiff, and then began attacking the plaintiff in the latter's front yard. Apparently a neighbor, Chad Bell, saw this alleged assault, and after he spoke up, Lucas then got in his car and left the scene. Defendant Dallas Donaldson

3

responded to the plaintiff's report of this incident.  The plaintiff was unhappy to see that Donaldson was one of the responding officers, due to the fact that when one of the minors who lived at the Lucas-Banky house was throwing bricks at the back of the plaintiff's house, Donaldson merely forced the minor to apologize to the plaintiff.  In the incident at bar, the plaintiff was again displeased with Donaldson's performance, stating that the latter largely treated the matter as a car accident, about which Donaldson was initially skeptical.  Afterwards, the plaintiff states that the local fire department was summoned to hose the pepper spray solution off of him.

Due to these conflicts and his concern about possible burglars, the plaintiff had previously installed security cameras on his house.[2]  One of the cameras monitored his front yard.  Prior to installing the cameras, the plaintiff states that he ran the proposal by attorney Burke Simmons to ensure that they were legal; the plaintiff also notes that the cameras were turned off "99.9% of the time."  Id. at 23.  The cameras displeased the plaintiff's neighbors to no end, who complained on "numerous occasions."  Id. at 6.  This dispute came to a head the day following the alleged assault by Lucas, when the plaintiff's neighbors called the

---

[2]  According to the plaintiff, the Humane Society suggested use of the cameras.  The plaintiff alleges that personnel of the Humane Society had become fearful of Lucas, and would not send female employees to the Lucas-Banky residence unless they were accompanied by a male colleague.  See id. at 24.

4

Parkersburg police to complain about one of the cameras, reporting that it was positioned on their minor child's bedroom window; the plaintiff believes that this call might have also been in retaliation for his pressing charges against Lucas. An officer was sent to the plaintiff's house at approximately 8 p.m. At that time, the plaintiff heard someone pounding on his front door. When the plaintiff asked who it was, the visitor replied that it was "Santa Claus;" this individual was later identified by the defendants as Police Officer Benjamin Ward. This answer terrified the plaintiff, who thought Lucas had come with his AR-15 assault rifle to "finish the job." Id. at 20. The plaintiff states that he grabbed his shotgun from the back room, loaded it, and was preparing to fire it through the window when he saw the police cruiser. The plaintiff pushed the gun underneath his couch and opened the door. After the plaintiff opened the door, Ward entered the plaintiff's home and, according to the plaintiff, started screaming at him.[3] Ward asked the plaintiff whether he had a security camera, and informed the plaintiff that there was "an emergency situation" with a "child in danger," id. at 22, and that the plaintiff's camera was pointed at an adolescent's bedroom. The

---

[3] According to the plaintiff, this officer had been to his residence twice in one day approximately a year earlier, when he called the police after children at his neighbor's house were repeatedly flashing their buttocks and giving the middle finger to his security camera, as well as repeatedly kicking a ball into his yard.

5

plaintiff states that he disputed this, and informed Ward that the camera was pointed down at the neighbor's dog. Ward purportedly demanded to see the camera, instructed the plaintiff to remove it, and told the plaintiff that he might come back with an arrest warrant. The plaintiff states that this incident was very upsetting to him, and after Ward left, the plaintiff called the police department and filed a complaint with a Sergeant Fox.

Defendant Ward recalls this incident differently. In an affidavit attached to the defendant's motion for summary judgment, he states that he initially arrived at the Banky residence in response to the complaint about the camera pointed at the child's bedroom. He denied calling himself "Santa Claus", and states that he solely identified himself as a member of the Parkersburg Police Department. Ward states that the plaintiff invited him into his home, and that he himself did not use force or threats to enter the residence. According to Ward, Libert voluntarily showed him what was being recorded by the camera, which was not the child's bedroom, and that Ward merely asked him to remove his camera in order to spare his neighbors some grief.

When the plaintiff called the police to follow up again two days later, he was informed that Lucas himself would be pressing charges against the plaintiff for the earlier fight; the plaintiff was then later arrested. Lucas alleged in his complaint that he was sprayed by the plaintiff and then "engauged [*sic*] in a physical

fight during a heated argument over a car accident." (# 16, ex. C, at 3). The charge against the plaintiff was dismissed in March or April of 2009, after the plaintiff refused to take any sort of deal, and Lucas apparently signed a diversion agreement.

## II. PROCEDURAL HISTORY

The plaintiff filed the instant civil action on April 22, 2010. (# 2). In his complaint, the plaintiff alleges that Ward unlawfully searched his house, that he was unlawfully arrested for the assault of Lucas, and that the police department failed to protect him from Lucas.

On June 2, 2010, the undersigned held an approximately forty minute status conference in this case. During the course of this hearing, the plaintiff was informed about the requirements of the discovery process, given a copy of the Federal Rules of Civil Procedure, and was referred to the Court's website for a copy of the Local Rules of Civil Procedure. On July 20, 2010, an order issued by the undersigned (# 11) pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), which included a citation to Roseboro, notified the plaintiff of his right to respond to any dispositive motions filed by the defendants, and additionally informed the plaintiff that he would need to provide sworn testimony or statements in support of any such responses.

The instant motion for summary judgment was filed on November 15, 2010. On February 25, 2010, pursuant to a request from the

undersigned, the defendants filed a copy of the plaintiff's deposition testimony.[4]

### III. STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). However, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[4] As the plaintiff did not include any sworn testimony or affidavits in his response and surreply, this transcript request by the Court has allowed the plaintiff to contest summary judgment.

*IV. DISCUSSION*

The plaintiff makes two federal claims and one state claim in his complaint. He alleges that Ward unlawfully searched his house; that he was maliciously prosecuted for assaulting Lucas; and that the defendants failed to protect him from Lucas. The court will address these claims in turn.

*A. The Plaintiff's Unlawful Search Claim*

In his complaint, the plaintiff alleges that "[d]ue to [Ward's] boisterous demands and aggressive manner I felt threatened and allowed [Ward] into my house . . . . I maintain [Ward] pushed his way into my house through threats of violence to my person. This search . . . was plainly a violation of my constitutional rights." (# 2 at 1).

The Fourth Amendment requires law enforcement officials to obtain a warrant before they conduct a search. U.S. Const. Amend. IV (protecting "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). Voluntary consent is an exception to this warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). Voluntary consent is based on the totality of the circumstances. See, e.g., Schneckloth, 412 U.S. at 223-34; United States v. Lattimore, 87 F.3d 647, 650 (4th

Cir. 1996); United States v. Analla, 975 F.2d 119, 124 (4th Cir. 1992). Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). See Lattimore, 87 F.3d at 650; United States v. Boone, 245 F.3d 352, 361-62 (4th Cir. 2001).

The defendants argue that they are entitled to summary judgment on this count due to the voluntary consent by the plaintiff to Ward's entry. In the alternative, they argue that they are entitled to qualified immunity. In his response and surreply, the plaintiff, inter alia, denies consenting to Ward's entry, and states that Ward was acting in a threatening manner and was implying the use of physical force. The defendants note in their reply, however, that the plaintiff testified at deposition that he let Ward into his house.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff consented to Ward's entry. While the undersigned appreciates that Ward may have caught the plaintiff at a stressful moment, the plaintiff opened the door for Ward, allowed him to enter, and did not order him to leave. At his deposition, the plaintiff testified several times that he let Ward into his home, see, e.g., # 27, ex. A, at 6, 21, and 27. When asked by

10

defense counsel whether he had let Ward into his house, in one instance the plaintiff replied that "[o]h, you better believe I let him in the house. I mean, I was scared." Id. at 27. Moreover, Ward was the only police officer present, and the plaintiff is a competent adult; in fact, he informed the court at the status conference that he has a master's degree. Looking at the totality of the circumstances, the plaintiff consented to Ward's search. Accordingly, there was no illegal search; the undersigned proposes that the presiding district judge **FIND** that the plaintiff has not shown that a genuine issue of material fact exists as to this claim, and that the defendants are entitled to judgment as a matter of law.

*B. The Plaintiff's Malicious Prosecution Claim*

The plaintiff also argues that he was maliciously prosecuted for assaulting Lucas. In his complaint, he alleges that "fictitious charges of battery were filed [against] me by the Parkersburg [Police Department] and later dismissed by the DA's office for 'lack of evidence.'" (# 2 at 1).

"[A]llegations that an arrest made pursuant to a warrant was not supported by probable cause . . . are analogous to the common-law tort of malicious prosecution." Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998). "[A] prima facie case of malicious prosecution must include (1) the initiation or maintenance of a proceeding against the plaintiff by the defendant;

11

(2) termination of that proceeding favorable to the plaintiff; (3) lack of probable cause to support that proceeding; and (4) the defendant's malice." Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000)

"In the criminal arrest context, probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 334 (4th Cir. 2009) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). The standard for whether probable cause exists is an objective one; it exists when, "at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984).

The court understands the plaintiff's frustration that he was arrested when Lucas was allegedly the person who began the altercation. However, at the time that the plaintiff's arrest occurred, the complaint of Lucas, which, as noted earlier, alleged that the plaintiff "engauged [sic] in a physical fight during a heated argument over a car accident", (# 16, ex. C, at 3), created probable cause for the plaintiff's arrest. Given the existence of

12

probable cause, the plaintiff cannot succeed on his malicious prosecution claim. See Lambert, supra. Therefore, the undersigned proposes that the presiding district judge **FIND** that the plaintiff has not shown that a genuine issue of material fact exists as to this claim, and that the defendants are therefore entitled to judgment as a matter of law.

*C. The Plaintiff's State Law Claim*

Finally, it appears that the plaintiff alleges that the defendants failed to protect him from his neighbors. In his complaint, the plaintiff describes this as "unprofessional conduct," (# 2 at 1), but he elaborated on this claim, which arises under West Virginia law, at his deposition. He testified that "they weren't giving me police protection from [Lucas] . . . . Because I had called before when we tried to get a restraining order . . . . [The police] came over [to his house] and were laughing." (# 27, ex. 1, at 17). "The police wouldn't do anything about it. I had no police protection, none." Id. at 19. When asked by defense counsel whether it

> [w]ould it be fair to say that your main complaint against the City of Parkersburg and the Police Department is with regard to their method of providing law enforcement or their failure to provide law enforcement to you,"

id. at 44, the plaintiff replied

> Yes . . . [F]ailure to provide, you know, adequate protection where I can protect myself and then just – they actually aggravated the situation even worse, because when they went out there they didn't do anything.

>Nothing was done.

Id.

West Virginia Code Section 29-12A-4(c)(2) states that "[p]olitical subdivisions are liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment." Exceptions to this provision are given in Section 29-12A-5(a). Section 29-12A-5(a)(5) states that a political subdivision is immune from liability if a loss or claim results from "... the method of providing police, law enforcement or fire protection." The Supreme Court of Appeals of West Virginia held that this phrase refers to "the decision-making or the planning process in developing a governmental policy, including how that policy is to be performed." Syllabus Point 4, Smith v. Burdette, 211 W. Va. 477, 566 S.E.2d 614 (2002). However, it "does not provide immunity to a political subdivision for the negligent acts of the political subdivision's employee performing acts in furtherance of a method of providing police, law enforcement or fire protection." Id. at Syllabus Point 5.

> [This immunity] is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment

14

>had been purchased.  We do not believe [the applicable statute] is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.

Id. at 617 (quoting <u>Mallamo v. Town of Rivesville</u>, 197 W. Va. 616, 626 (1996)).  The court then held in <u>Burdette</u> that "while the City of St. Albans may be immune from liability for negligence in creating a policy of permitting police officers to drive through red-lighted intersections in emergencies, the City may be held liable if a police officer negligently carries out that policy." Id. at 617-18.

The Supreme Court of Appeals of West Virginia has held that Section 29-12A-5(a)(5) "incorporates the common-law special duty rule and does not immunize a breach of a special duty to provide, or the method of providing, such protection to a particular individual."  <u>Randall v. Fairmont City Police Dept.</u>, 186 W. Va. 336, 347 (1991).  "The duty . . . to provide police protection runs ordinarily to all citizens and is to protect the safety and well-being of the public at large; therefore, absent a special duty to the plaintiff(s), no liability attaches to a municipal . . . police department's failure to provide adequate . . . police protection.  However, [i]f a special relationship exists between a local governmental entity and an individual which gives rise to a duty to such individual, and the duty is breached causing injuries,

15

then a suit may be maintained against such entity." Rhodes v. Putnam County Sheriff's Dept., 207 W. Va. 191, 194 (1999) (internal citations and quotations omitted). "To establish that a special relationship exists between a local governmental entity and an individual, which is the basis for a special duty of care owed to such individual, the following elements must be shown: (1) an assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking." Id. (quoting Syllabus Point 2, Wolfe v. City of Wheeling, 182 W. Va. 253 (1989)). In Rhodes, the plaintiff, Rhodes, had been the employer of one Jamie Eggleston, an inmate in the Putnam County Jail who was also participating in a work-release program. Rhodes laid Eggleston off, and then informed the Putnam County Sheriff's Department of this action, stating that Eggleston should not be given work release until further notice. "Mr. Rhodes also said that Mr. Eggleston was 'acting funny or different' and he did not want Mr. Eggleston near him or his job site. According to Mr. Rhodes, Officer Little told him that he would leave a note informing other employees of the Sheriff's Department that Mr.

16

Eggleston was not to have any contact with him or his business." Id. at 193. Eggleston escaped from custody the following day, and went to Rhodes' place of business. "After talking with him, Mr. Eggleston agreed to allow Mr. Rhodes and one of his employees to take him back to jail. During the trip to the jail, however, Mr. Eggleston demanded that Mr. Rhodes stop and let him exit the vehicle. When Mr. Rhodes stopped the vehicle, Mr. Eggleston pulled out a handgun and shot him in the chest and back." Id. The Supreme Court of Appeals held that there was no evidence of a special relationship.

> While it is undisputed that there was direct contact between Mr. Rhodes and the Sheriff's Department via Mr. Rhodes' phone call to Officer Little on July 25, 1996, there is no evidence that Officer Little or the Sheriff's Department knew that . . . Mr. Eggleston was going to harm Mr. Rhodes. There is also no evidence that the Sheriff's Department promised Mr. Rhodes that it would prevent Mr. Eggleston from harming him if Mr. Eggleston escaped. Likewise, there is no evidence that Mr. Rhodes relied upon any alleged promise made by the Sheriff's Department to protect him from harm by Mr. Eggleston. In fact, when Mr. Eggleston appeared at his construction site, Mr. Rhodes did not phone the Sheriff's Department.

Id. at 194. The court distinguished Rhodes' case from Randall, noting that

> Randall was a wrongful death/negligence action brought by the estate of Sandra Johnson against the Fairmont City Police Department and its chief of police and dispatcher. Ms. Johnson was murdered by Zachary Curtis Lewis while she sat in her automobile outside the police department blowing her horn attempting to get help from the police officers inside the building. Prior to the murder, Ms. Johnson had made numerous phone calls to the police department reporting that Mr. Lewis had threatened her and that she feared for her safety and her life. Although

>      there was an outstanding arrest warrant for Mr. Lewis,
>      the city police and other law enforcement officers had
>      not taken any action to apprehend and arrest him.

Id. at 195.

Further, West Virginia Code Section 29-12A-5 states that an employee of a political subdivision is immune from liability unless "(1) [h]is or her acts or omissions were manifestly outside the scope of employment or official responsibilities; (2) [h]is or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) [liability is expressly imposed upon the employee by a provision of this code."

Viewing the evidence in the light most favorable to the non-moving party, the plaintiff has suffered continual harassment at the hands of his neighbors.  Unfortunately, the plaintiff has not overcome the hurdle of proving that a special relationship existed between him and the defendants such that they owed him a special duty of care.  As required by Wolfe, the plaintiff can possibly demonstrate knowledge on the part of the defendants that their inaction could lead to harm and, further, that some form of direct contact occurred between him and the City of Parkersburg's agents. However, the plaintiff has failed to make an evidentiary showing sufficient to establish the elements of an assumption by the defendants, through promises or actions, of an affirmative duty to act on behalf of the plaintiff and, additionally, some reliance by the plaintiff on an affirmative undertaking by the defendants.

Rather, evidence suggests that rather than relying on the defendants, the plaintiff grew frustrated at their inaction. There is also no evidence that the defendants promised protection from Lucas to the plaintiff.[5] Accordingly, the undersigned proposes that the presiding district judge **FIND** that the plaintiff has failed to make an evidentiary showing sufficient to establish a special duty of care.

## *V. RECOMMENDATION*

It is respectfully **RECOMMENDED** that the motion for summary judgment (#16) filed by the defendants be granted.

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for

---

[5] Given this holding, the court need not address whether the other requirements of the West Virginia Governmental Tort Claims and Insurance Reform Act have been met.

19

good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the presiding District Judge.

The Clerk is directed to file this Proposed Findings and Recommendation, mail a copy to Plaintiff and transmit it to counsel of record.

                              ENTER: March 11, 2011

                              *Mary E. Stanley*
                              Mary E. Stanley
                              United States Magistrate Judge